IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DEATHRA P. | ) |
| Plaintiff, | ) |
| | ) No. 18 C 5882 |
| v. | ) |
| | ) Magistrate Judge Gabriel A. Fuentes |
| ANDREW M. SAUL, Commissioner of Social Security,[1] | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER[2]

Plaintiff, Deathra P.,[3] applied for Disability Insurance Benefits ("DIB") on January 13, 2015 and Supplemental Security Income Benefits ("SSI") on April 30, 2015, alleging she became

---

[1] The Court substitutes Andrew M. Saul for his predecessor, Nancy A. Berryhill, as the proper defendant in this action pursuant to Federal Rule of Civil Procedure 25(d) (a public officer's successor is automatically substituted as a party).

[2] On October 2, 2018, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to a United States Magistrate Judge for all proceedings, including entry of final judgment. (D.E. 9.) On May 31, 2019, this case was reassigned to this Court for all proceedings. (D.E. 28.)

[3] The Court in this opinion is referring to Plaintiff by her first name and first initial of her last name, thereby suppressing her last name, in compliance with Internal Operating Procedure No. 22 of this Court. IOP 22 presumably is intended to protect the privacy of plaintiffs who bring matters in this Court seeking judicial review under the Social Security Act. The Court notes that suppressing the names of litigants is an extraordinary step ordinarily reserved for protecting the identities of children, sexual assault victims, and other particularly vulnerable parties. *Doe v. Vill. of Deerfield*, 819 F.3d 372, 377 (7th Cir. 2016). Allowing a litigant to proceed anonymously "runs contrary to the rights of the public to have open judicial proceedings and to know who is using court facilities and procedures funded by public taxes." *Id.* A party wishing to proceed anonymously "must demonstrate 'exceptional circumstances' that outweigh both the public policy in favor of identified parties and the prejudice to the opposing party that would result from anonymity." *Id.*, citing *Doe v. Blue Cross & Blue Shield Unites of Wis.*, 112 F.3d 869, 872 (7th Cir. 1997). Under IOP 22, both parties are absolved of making such a showing. Put to such a showing here, a party may well be able to demonstrate that suppressing the surname of the plaintiff inflicts little or no prejudice upon the government defendant, but establishing that the circumstances favoring privacy are so exceptional as to outweigh the public policy in favor of identified parties would be more challenging. In any event, the Court is abiding by IOP 22 subject to the Court's concerns as stated. The Court's understanding is that the claimants are not anonymous litigants, in that their names in all of these matters brought for judicial review under the Social Security Act are otherwise available upon a review of the public docket.

disabled on January 8, 2015 due to Idiopathic Pulmonary Fibrosis, Bronchogenic Cyst in Lung, Fractured Ribs, Asthma, Acute Bronchitis, Arthritis, Fibromyalgia, Anxiety, and Acute Sinutis. (R. 44-45, 197, 199.) Her date last insured was September 30, 2018. (R. 44.)

Plaintiff's claims were denied initially and on reconsideration, after which she requested a hearing by administrative law judge ("ALJ"). (R. 102.) Plaintiff appeared and testified at a hearing on March 13, 2017, after which the ALJ issued a written opinion denying Plaintiff's application for benefits. (R. 102-112.) The Appeals Council denied Plaintiff's request for review of the ALJ's decision (R. 1-6), making the ALJ's decision the final decision of the Commissioner. *Jozefyk v. Berryhill*, 923 F.3d 492, 496 (7th Cir. 2019). Plaintiff has filed a motion to reverse or remand the Commissioner's decision denying his applications for benefits (D.E. 14), and the Commissioner has filed a cross-motion asking the Court to affirm the decision (D.E. 24). The matter is now fully briefed. For the following reasons, the Court grants Plaintiff's motion to remand and denies the Commissioner's motion to affirm.

I.  **MEDICAL HISTORY**

Plaintiff was born on March 1, 1969. (R. 47.) She was hospitalized from January 8, 2015 until January 11, 2015 for new onset acute asthma, acute bronchitis causing a closed rib fracture, and a bronchogenic cyst in her lung. (R. 365.) She was discharged with prescriptions for a number of different medications to treat her asthma, cough, and pain. (R. 366.) Plaintiff was hospitalized again from March 20, 2015 until March 21, 2015 because of another asthma attack and was discharged on the steroid Prednisone and with a breathing treatment. (R. 423.) She was directed to follow up with a pulmonologist for management of her asthma and for monitoring of her lung nodule. (*Id.*) Throughout the first half of 2015, Plaintiff visited the outpatient clinic at Cook County Hospital for treatment of her asthma and lung nodule, fibromyalgia, chronic bronchitis, and sleep

2

apnea (R. 487-91, 529.) She also took medication for anxiety, which kept the condition stable. (R. 491, 495.)

Plaintiff began treating with pulmonologist Sejal Thaker, M.D. in May 2015. (R. 550.) At the time, a spirometry revealed moderate restriction in her lung function. (R. 551.)[4] In September 2015, Dr. Thaker noted normal pulmonary function testing and that Plaintiff's asthma was managed with medication; she had been able to discontinue her nebulizer use. (R. 545-46.) Dr. Thaker suggested Plaintiff undergo a sleep study to test for possible obstructive sleep apnea and have a follow up CT scan in January to monitor her bronchial cyst. (*Id.*, R. 548.) Dr. Thaker also noted that Plaintiff was seeking disability because of her fibromyalgia, and that she was taking numerous herbal medications to treat it. (R. 547.)

Plaintiff first visited the rheumatology clinic at Advocate Medical Center in July 2015. (R. 572.) At the time, she reported experiencing diffuse body aches over the previous year and parathesias (burning and prickling feeling) in her legs. Notes from this appointment instructed her to "stay with Elavil 12.5 mg" and to "stay with Ibuprofen." (R. 574.)[5] During an October 2015 appointment, Plaintiff described her symptoms as "mild to moderate" and an exam showed abnormalities and reduced range of motion in her shoulders, thoracic and lumbar spine, knees, and feet. (R. 566-68). She was still taking Elavil for pain and notes from the appointment explain that

---

[4] Spirometry is a common test used to assess how well a patient's lungs work, and can be used to both diagnose conditions such a asthma as well as to monitor lung conditions. https://www.mayoclinic.org/tests-procedures/spirometry/about/pac-20385201. *Visited on* November 4, 2019.

[5] Elavil, or amitriptyline, is an antidepressant medication that is commonly used to treat pain from fibromyalgia. https://www.ncbi.nlm.nih.gov/books/NBK492992/, visited on December 2, 2019. It is not clear from the record who first prescribed Elavil for Plaintiff or why doctors' notes from her pulmonology appointments do not mention it, although it is listed as a current medication in notes from all of her rheumatology appointments starting with her initial July 2015 appointment with the Advocate rheumatology clinic.

3

she was unable to tolerate a higher dose and unable to take the pain medication Lyrica because of concerns about side effects. (R. 570.) An X-ray of Plaintiff's knees showed minimal narrowing of the medial compartments and imaging of her back showed facet degeneration changes in her lumbar spine, which was assessed as "minimal probable degenerative anterolisthesis of L4 and L5." (R. 566-68.)[6] In November 2015, Plaintiff visited Advocate Medical Group for a check-up and medication management. (R. 559.) Records show that Plaintiff was taking twelve prescription medications at the time including Elavil for her fibromyalgia, several asthma medications (including an inhaler), and a pain killer for her back pain. (R. 562.) Her asthma was described as "controlled" at the time. (*Id.*)

In February 2016, Dr. Thaker wrote a letter to Jesse Gordon, M.D., at the MacNeal Family Practice Center about Plaintiff's treatment of her asthma and the results of her recent CT scan of her bronchial cyst. (R. 592, 608.) Dr. Thaker explained that Plaintiff continued to have significant shortness of breath on exertion and had recently experienced an exacerbation of her fibromyalgia, for which she had "numerous herbal medications on board."[7] (*Id.*) She had not yet undergone the recommended sleep study to assess her pulmonary hypertension. (*Id.*) At a rheumatology appointment also in February 2016, Plaintiff continued to describe her fibromyalgia symptoms as "mild to moderate" and continued to take Elavil to treat her pain. (*Id.*) At another rheumatology appointment in August 2016, Plaintiff's doctor ascribed her back pain to her fibromyalgia and doubled her Elavil dosage; notes explain that Plaintiff did not want to take the stronger pain

---

[6] Anterolisthesis is a condition in which one of the vertebrae slips out of place onto the bone below it. https://my.clevelandclinic.org/health/diseases/10302-spondylolisthesis. *Visited on* December 4, 2019.

[7] As stated above, it is not clear why Dr. Thaker remained unaware that Plaintiff was also taking Elavil for her fibromyalgia, but his letter to Dr. Gordon only lists the two medications Plaitniff was taking for her asthma (Symbicort and Albuterol) and an anxiety medication. He does not mention any of the other ten or so prescription medications that her rheumatology notes reflect her taking at the time.

4

medication Mobic because of concerns about side effects, particularly the risk of a cardiac event. (R. 639-42, 650.)

At a general check-up with Advocate Medical Group in January 2017, notes show Plaintiff's "active problems" as including, among others, Achilles tendinitis of right lower extremity, anxiety, chronic lumbar pain, degenerative joint disease involving multiple joints, fibromyalgia, mild intermittent asthma without complication, numbness, sleep apnea and right ankle pain. (R. 627.) Her physical examination at the time was generally unremarkable. (*Id.*) At appointments with Dr. Thaker in November 2016 and February 2017, Plaintiff had normal pulmonary function and spirometry, although she used her Albuterol inhaler four to five times per day. (R. 590-94.) Dr. Thaker suggested Plaintiff undergo a PET scan to monitor her bronchial cyst and directed Plaintiff to follow up with a sleep specialist to treat her recently diagnosed sleep apnea and her rheumatologist to treat her fibromyalgia. (*Id.*)

Plaintiff underwent a physical consultative examination by Carolyn Hildreth, M.D. on June 11, 2015. (R. 71.) Dr. Hildreth noted crackles in Plaintiff's lungs that improved after she coughed, a normal gait, mild difficulty walking on her toes and heels and with her tandem gait, moderate difficulty squatting, decreased range of motion in her lumbar spine, hips and knees and no evidence of reduced neurological function. (R. 506-07.) Dr. Hildreth assessed Plaintiff's chief medical problems as idiopathic pulmonary fibrosis with asthma and acute bronchitis, a bronchogenic cyst in her lung, fractured ribs associated with her lung issues and bronchitis, a "long history of fibromyalgia" that caused persistent pain in multiple areas of her body and reduced range of motion in some joints, arthritis related to her fibromyalgia, and anxiety. (R. 507-08.)[8]

---

[8] Plaintiff also underwent a mental status evaluation by Patricia Morrin, Psy.D., which led to a psychiatric review by State Agency doctor Kurt Boyenga, Ph.D. (R. 49, 535-40.) Based on Dr. Morrin's examination, Dr. Boyenga evaluated Plaintiff as having mild restrictions in her activities of daily living, maintaining social functioning, and

5

State Agency doctor B. Rock Oh, M.D. evaluated the record in August 2015 noted that Plaintiff complained of shortness of breath and had a diagnosis of bronchitis and asthma, that a chest CT showed a subcarinal cyst, and that she was diagnosed with pulmonary hypertension. (R. 49-59.) A lung exam was significant for coarse crackles that improved with coughing. (*Id.*) Plaintiff did not have a diagnosis of idiopathic pulmonary fibrosis and did not use home oxygen. (*Id.*).[9] Dr. Oh found Plaintiff only partially credible, although his notes do not indicate why. Dr. Oh assessed Plaintiff as having a residual functional capacity ("RFC") to lift or carry up to 20 pounds occasionally, to lift up to 10 pounds frequently, and to stand and/or walk for two hours and sit for six hours in an eight-hour work day. (R. 50.) Dr. Oh ascribed his two-hour standing/walking limitation to Plaintiff's diagnosis of chronic bronchitis/asthma, pulmonary hypertension, and obesity. (*Id.*) Dr. Oh also included postural limitations in Plaintiff's RFC, due to her fibromyalgia and obesity and physical limitations noted at Plaintiff's consultative evaluation. (R. 51.) Ultimately Dr. Oh determined Plaintiff was able to perform her previous job as a switchboard operator and was not disabled. (R. 62, 66.) Dimitri Teague, M.D. confirmed Dr. Oh's RFC analysis on December 6, 2015. (R. 79.)

The record contains a single medical opinion from one of Plaintiff's treating doctors. In September 2015, Dr. Thaker completed a pulmonary RFC questionnaire that characterized Plaintiff's asthma as severe and generally precipitated by upper respiratory infections, stress, and

---

maintaining concentration, persistence or pace, and with no episodes of decompensation. (R. 48.) In support of this finding, Dr. Boyenga noted that the record reflected complaints of panic and anxiety to various doctors, that Dr. Morrin diagnosed Plaintiff with adjustment disorder with anxiety and depressed mood, and that a family doctor had prescribed medication, but mental health treatment was not documented in the record. (*Id.*) Dr. Boyenga also determined that Plaintiff's limitations in daily functioning were primarily related to her physical and not mental impairments. (*Id.*)

[9] Dr. Hildreth's "clinical impression" examination notes lists Plaintiff's "Problem # 1" as "Idiopathic pulmonary fibrosis with asthma and acute bronchitis." (R. 507.)

changes in weather. (R. 552.) Dr. Thaker opined that Plaintiff would frequently experience pain or other symptoms severe enough to interfere with her attention and concentration at work, that she was capable of tolerating only low stress jobs, and that she would miss more than four days of work per month because of her symptoms. (*Id.*) Dr. Thaker opined that Plaintiff could sit for two hours before needing to get up and stand for 30 minutes before needing to sit; she could sit for a total of two hours in an eight-hour work day and stand or walk for a total of two hours in a work day, but would need to take unscheduled breaks as well. (R. 553.) Finally, she could lift no more than 10 pounds rarely and had to avoid exposure to all environmental irritants and extremes of temperature. (R. 554.)

## II. HEARING TESTIMONY

At the hearing, Plaintiff testified that she had worked a variety of data entry jobs until July 2014 when she moved home to Chicago from Atlanta to care for her ill father. (R. 23.) Although Plaintiff tried to find a job in Chicago, she suffered from various illnesses that culminated with her hospitalization and diagnoses of asthma and lung disease in January 2015. (R. 23-24.) These impairments, coupled with her fibromyalgia, prevented her from working. (*Id.*)

With respect to her activities of daily living ("ADLs"), Plaintiff testified that she drives three or four times a week but that when she's fatigued, her mother has to do some of the driving and that fatigue similarly makes it difficult for her to complete household chores without needing to stop and rest every fifteen minutes or so. (R. 25.) She can wash dishes, sweep, do laundry once per week, and prepare simple meals, but all of these activities are limited and often cut short by her exhaustion. (R. 25-26.) Plaintiff also testified that she can grocery shop for a few days of groceries at a time before having to stop because of fatigue; she usually can buy one bag of groceries before having to stop. (R. 27.) She can no longer participate in activities such as traveling

or going to the mall, and although she goes to the movies, it is difficult for her to sit through an entire show. (R. 29.) On days when she wakes up fatigued, she can only sit and watch television all day. (R. 26.)

The ALJ asked Plaintiff a number of questions about her ability to work with particular limitations. On questioning about whether she could perform a job that primarily required her to sit, Plaintiff testified that she could sit for up to "an hour or an hour and a half" before having to get up. (R. 35-36.) She further explained that after sitting for 90 minutes, she had to get up and walk around and stretch for 15 minutes. (*Id.*) The ALJ also asked Plaintiff if she could "just get up and stand for a second and go sit back down or what do you have to do to deal with that discomfort after you've been sitting for a while?" and Plaintiff testified that she "would have to stand, stretch, walk around, sit back down." (R. 35.) The ALJ then confirmed again that the breaks Plaintiff described would last for 15 minutes. (R. 36.)

When the ALJ asked Plaintiff if she was taking any medication besides Ibuprofen for her fibromyalgia, she testified that she is "hyper sensitive" to the side effects of medication, so for the anxiety portion of her fibromyalgia she takes an herb along with the medication Clonazepam for panic attacks.[10]

The ALJ gave two hypotheticals to the VE. In relevant part, the first hypothetical asked about an individual who could work at the light exertional level but could only stand and walk for two hours in an eight-hour work day and sit for six hours in an eight-hour work day, with normal

---

[10] As we explain below, the medical record also shows that Plaintiff was taking the prescription medication Elavil to treat her fibromyalgia; we do not know why Plaintiff did not mention this medication during her testimony. We note, however, that Plaintiff's testimony regarding the medications she was taking for her fibromyalgia-induced anxiety does not preclude the fact that she was also taking prescription medications for pain.

8

breaks (R. 38.)[11] The VE testified that and individual with these limitations would be able to perform Plaintiff's previous jobs of accounting clerk, switch board operator, and data entry clerk as well as additional jobs such as address clerk and charge clerk. (R. 37-38.) The second hypothetical had the same limitations but added a sit/stand option that allowed the individual to stand for 30 minutes after sitting for one and a half hours, provided that the person was not off task more than 10 percent of the work period. (R. 39.) In such a case, the VE testified that an individual would not be able to perform the data entry job but could still perform as an account clerk and switchboard receptionist as well as an order clerk. (R. 39-40.)

### III. ALJ OPINION

In his opinion, the ALJ went through the five-step inquiry for determining disability. 20 C.F.R. §§ 404.1509, 404.1520. At Step One, he found that Plaintiff had not engaged in substantial gainful work since her alleged onset date of January 8, 2015. (R. 104.) At Step Two, he found she had the following severe impairments: obstructive sleep apnea, respiratory bronchitis interstitial lung disease, obesity, fibromyalgia, hypertension, polycystic ovarian syndrome, and osteoarthritis. (*Id.*). At Step Three, the ALJ found that Plaintiff did not meet a Listing for musculoskeletal disorders, respiratory disorders, or cardiovascular disorders. (R. 106.) With respect to Plaintiff's obesity, the ALJ explained that, while there is no specific Listing for obesity, SSR 02-1 requires consideration of obesity in determining each step of the process, including whether impairments are severe, whether they meet a Listing, and whether it affects Plaintiff's RFC. (R. 106.) The ALJ also stated that he considered SSR 12-2p, which provided guidance on fibromyalgia, given that there is no Listing specifically addressing it. (*Id.*)

---

[11] The ALJ's hypotheticals included a number of additional postural and environmental limitations that are not relevant to our analysis but that were ultimately included in his RFC determination.

9

The ALJ then set Plaintiff's RFC and determined that Plaintiff had the ability to perform light work with the additional limitations that she stand and/or walk for two hours out of an eight-hour day and sit for six hours out of an eight-hour day. (R. 107.) The ALJ also added that Plaintiff never climb ladders, ropes or scaffolds but occasionally climb ramps and stairs, balance, stoop, crouch, kneel and crawl; that she avoid concentrated exposure to extreme cold, heat, humidity, unprotected heights, use or exposure to moving machinery, and pulmonary irritants such as fumes, odors, dusts and gases. (*Id.*) Finally, the ALJ included a sit/stand option that would allow Plaintiff to stand for 30 minutes after sitting for 90 minutes, provided that she was not off task for more than 10 percent of the work period. (*Id.*)

In supporting his RFC determination, the ALJ discussed the Plaintiff's testimony that she has been prevented from working since 2014 because of her lung disease and asthma and that an asthma questionnaire she completed stated that she uses an inhaler multiple times per day. (*Id.*) The ALJ noted that Plaintiff also testified that her symptoms, including fibromyalgia pain and fatigue, have worsened since she filed her application for benefits. (*Id.*) In discussing Plaintiff's testimony about her ADLs, the ALJ recognized that she testified being able to perform a household chore such as washing dishes or sweeping for 15 minutes before needing to sit for 15 minutes. (R. 107.) The ALJ did not mention Plaintiff's testimony that after sitting for 90 minutes, such as at a job, she must get up and stretch and walk around for 15 minutes. (R. 36.)

The ALJ reviewed Plaintiff's history of asthma treatment and concluded that after her January 2015 and March 2015 hospitalizations for acute asthma attacks, her condition was essentially stable. (R. 108.) Although a May 2015 CT scan that showed a worsening of her right lung, subsequent records showed stable findings, including evidence that Plaintiff felt better after switching asthma medications in September 2015, that in November 2015 her asthma and

hypertension were controlled, and that a February 2016 chest CT showed that Plaintiff had a stable nodule and lesion in her lung over the past two years. (R. 107-08.) In November 2016 Plaintiff had a stable respiratory status and normal pulmonary function, and at a January 2017 follow-up appointment, Plaintiff's asthma was mild, intermittent, she had no chest pain, and her sleep apnea was described as mild. (*Id.*) She also had a normal spirometry in February 2017. (R. 108).

The ALJ acknowledged Plaintiff's obesity and osteoarthritis and reports of degenerative disk disease but noted that examination reports did not indicate any musculoskeletal limitations, and that radiology reports from October 2015 showed only minimal narrowing in Plaintiff's knee joints and minimal probable degenerative anterolisthesis of the spine. (*Id.*) As for Plaintiff's fibromyalgia diagnosis, the ALJ noted "very conservative treatment, including herbal medications." (R. 108.) The ALJ pointed to treatment records in July 2015 and February 2016 that describe intermittent fibromyalgia symptoms of mild to moderate degree, and also pointed to an April 2016 physical therapy evaluation for pain that showed "limiting pain behaviors that were inconsistent with other observed functional limitations." (R. 108.)

In addressing Plaintiff's credibility, the ALJ stated that Plaintiff's allegations about her symptoms were "not entirely consistent" with the medical evidence. (R. 109.) He listed seven factors to consider when assessing a claimant's credibility: (1) daily activities; (2) location, duration, frequency and intensity of pain; (3) factors that aggravate the symptoms; (4) type, dosage, effectiveness and side effects of medication; (5) treatment other than medication; (6) measures other than treatment claimant uses to relieve pain; and (7) any other factors that concern claimant's functional limitations due to pain. (*Id.*)

The ALJ then concluded that Plaintiff had not received the type of treatment "one would expect for a person suffering from the degree of pain and limitation contended." (*Id.*). The ALJ

concluded that Plaintiff's use of Ibuprofen and herbal medication for her pain reflected conservative treatment of her arthritis and fibromyalgia, and that the fact that she used inhalers but no in-home oxygen for her asthma, and had been recommended a CPAP machine for her sleep apnea, similarly showed that her symptoms and limitations were not as severe as she contended. (*Id.*) Next, the ALJ explained that Plaintiff's presentation at the hearing, appearing comfortable while sitting and walking in and out of the hearing room and being able to sit throughout the hearing without any overt pain signs, indicated that she did not have any limitations beyond the RFC assessed. (R. 110.) Finally, the ALJ also discussed Plaintiff's daily activities, stating that Plaintiff testified she "drives about 3-4 times per week, washes dishes, does laundry, cares for her personal needs, grocery shops, and uses a computer . . . goes to restaurants, goes to the movies, and makes simple meals." (R. 110.) The ALJ stated that these activities were inconsistent with Plaintiff's alleged severity of symptoms. (*Id.*)

As for the opinion evidence, the ALJ gave Dr. Thaker's opinion little weight because the ALJ found that the severity of limitations was inconsistent with the treatment records. (R. 109.) Specifically, the ALJ noted stability of Plaintiff's respiratory impairments with medication, normal pulmonary function testing, and the report of mild to moderate fibromyalgia symptoms. (*Id.*) Further, the ALJ opined that the assessed limitations were inconsistent with Plaintiff's activities of daily living. (*Id.*) Instead, the ALJ gave the State Agency doctors' RFC opinions great weight "as those of non-examining expert sources," and because they were consistent with the conservative treatment of record. (*Id.*) The ALJ explained that he added the sit/stand option on his own to give Plaintiff's subjective complaints of pain "the maximum benefit of the doubt." (*Id.*)

## IV. ANALYSIS

The Court's review of the ALJ's decision "is deferential; we will not reweigh the evidence or substitute our judgment for that of the ALJ." *Summers v. Berryhill*, 864 F.3d 523, 526 (7th Cir. 2017). "The ALJ's decision will be upheld if supported by substantial evidence, which means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Jozefyk*, 923 F.3d at 496 (internal citations and quotations omitted). "An ALJ need not address every piece of evidence, but he must establish a logical connection between the evidence and his conclusion," *i.e.*, "build an accurate and logical bridge" between the evidence and his conclusion. *Lanigan v. Berryhill*, 865 F.3d 558, 563 (7th Cir. 2017). "Where substantial evidence supports the ALJ's disability determination, we must affirm the decision even if reasonable minds could differ concerning whether the claimant is disabled." *L.D.R. by Wagner v. Berryhill*, 920 F.3d 1146, 1152 (7th Cir. 2019) (internal citations and quotations omitted). Relevant here, prior to Step Four, an ALJ determines a claimant's RFC, or "what an individual can still do despite his or her limitations." S.S.R. 96-8p. The ALJ must explain how he reached his conclusion about the residual functional capacity of a claimant and support that conclusion with evidence from the record. *See, e.g.*, SSR 96-8p, case 1996 WL 374184, at *7 ("The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts ... and nonmedical evidence[.]").

Plaintiff makes three arguments in favor of remand: (1) the ALJ's analysis of Plaintiff's credibility was flawed because it violated SSR 16-3p; (2) the ALJ's RFC determination was faulty; and (3) the ALJ improperly weighed the medical opinions. We remand because of flaws in the ALJ's RFC determination, but as we explain below, these flaws stem from errors the ALJ made in

13

evaluating Plaintiff's credibility and the medical opinions. Therefore, our analysis will touch on all three of Plaintiff's assignments of error.

**A. Credibility Determination**

The ALJ made several errors assessing Plaintiff's credibility when he stated that the frequency and severity of her symptoms were "not entirely consistent" with the evidence.[12] These errors, in turn, affected the ALJ's consideration of other evidence in the medical record and how he used that evidence to construct Plaintiff's RFC. An ALJ's credibility determination is entitled to great deference, but it must be justified with specific reasons and have support in the record. *See* SSR 96–7p; *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir.2012); *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir.2009); *Steele v. Barnhart*, 290 F.3d 936, 941–42 (7th Cir. 2002).

*First*, the ALJ impermissibly decided that Plaintiff's treatment was too conservative to support the severity of symptoms and limitations she alleged. An ALJ may not "play doctor" or reach his own independent medical conclusion without support from the medical evidence. *Myles v. Astrue*, 582 F.3d 672, 677 (7th Cir. 2009). While an ALJ may consider conservative treatment in assessing the severity of a condition, he or she should cite medical evidence about what kind of

---

[12] The Court addresses one of Plaintiff's arguments that counsel has continued to raise despite repeated rejection by this Court: Plaintiff's argument that the ALJ's use of the phrase "not entirely consistent with the medical record" in describing Plaintiff's allegations improperly increased Plaintiff's evidentiary burden. (Pl.'s Mem. at 7-8.) "[T]his statement has nothing to do with the preponderance of the evidence standard. Instead, it merely reflects another ALJ's use of language that the Seventh Circuit has repeatedly described as meaningless boilerplate because it yields no clue to what weight the ALJ gave the testimony." *Phillips v. Berryhill*, No. 17 C 4509, 2018 WL 4404665, at *6 (N.D. Ill. Sept. 17, 2018) (internal quotations and citations omitted). "The fact that the ALJ used boilerplate language does not automatically undermine or discredit the ALJ's ultimate conclusion if he otherwise points to information that justifies his credibility determination." *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019) (internal citations and quotations omitted). Courts in this district have repeatedly rejected the argument that this boilerplate language changes the claimant's evidentiary burden. *See, e.g., Charah C. v. Saul*, No. 18 C 3261, 2019 WL 3386989, at *11 (N.D. Ill. July 26, 2019); *Michelle G. v. Berryhill*, No. 18 C 408, 2019 WL 2368618, at *7 (N.D. Ill. June 3, 2019); *Randall M. v. Berryhill*, No. 18 C 2101, 2019 WL 2473829, at *6 (N.D. Ill. June 13, 2019); *Stephen M. v. Berryhill*, No. 17 C 7608, 2019 WL 2225986, at *9 (N.D. Ill. May 23, 2019).

treatment would be appropriate. *See, e.g., Thomas v. Colvin*, No. 13 C 3686, 2015 WL 515240, at *4 (N.D. Ill. Feb. 6, 2015) ("Merely characterizing treatment as 'conservative' fails to consider whether options would have been available and appropriate for [Plaintiff's conditions]."). Additionally, the ALJ must consider the reasons a claimant has undergone only conservative treatment before making a judgment about the severity of the claimant's conditions. *Hill v. Colvin*, 897 F.3d 862, 868 (7th Cir. 2015). In this case, not only did the ALJ decide on his own that Plaintiff's use of herbal medications to treat her fibromyalgia was evidence that her pain was not as severe as she alleged, but his inference was based on an error. The evidence shows that Plaintiff was taking the prescription medication Elavil to treat her fibromyalgia pain in addition to herbal medications, a fact the ALJ fails to acknowledge. Moreover, both Plaintiff's testimony and the medical record reflect that Plaintiff could not take stronger pain medication because of the concern about side effects, a factor the ALJ does not discuss. The ALJ made a similarly incorrect conclusion about Plaintiff's asthma treatment, determining on his own both that her lack of use of at-home oxygen as well as the fact that she had been prescribed a CPAP machine demonstrated that her asthma was not as severe as alleged.[13]

*Next,* the ALJ failed to support his reliance on Plaintiff's ADLs and her ability to sit through the hearing without having to stand up as evidence that her testimony about her symptoms was not entirely credible. It is true that an ALJ may take into account a claimant's ADLs when determining credibility. *Burmster v. Berryhill*, 920 F.3d 507, 511-12 (7th Cir. 2019). But in this case, the ALJ relied on Plaintiff's ADLs as if she were able to complete all of them without any difficulty when in fact, Plaintiff testified that she is unable to complete any of the tasks without having to take

---

[13] As Plaintiff points out in her brief, we do not understand why the ALJ considered Plaintiff's need to treat her sleep apnea with a CPAP machine as evidence that her asthma was not as severe as she alleged. There is nothing in the record to support the ALJ's statement.

15

breaks every 15 minutes or having to completely stop some of them in the middle. This amounts to impermissible "cherry picking" of the evidence to include only those pieces that support the ALJ's decision. *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). Determining that Plaintiff's testimony was not credible based on her ability to sit through the hearing is also error. Although SSR 16-3p allows an ALJ to consider his own observations when determining a claimant's credibility, the ALJ's conclusions still must be adequately supported. SSR 96-8p. Plaintiff testified that she can sit for up to 90 minutes before having to stand and stretch; the hearing lasted 33 minutes and thus Plaintiff's behavior was entirely consistent with her testimony. (R. 17, 43.) We find that the ALJ failed to build a logical bridge from the evidence to his conclusion that Plaintiff's testimony about her pain and symptoms was not entirely credible. Therefore, as we explain below, to the extent that the ALJ's RFC determination rested on his belief that Plaintiff had fewer limitations on working than she alleged, we also find this conclusion to be unsupported.

**B. Sit/Stand Option**

The ALJ added a sit/stand option to Plaintiff's RFC that allowed her to stand for 30 minutes after sitting for 90 minutes. He explained that the addition addressed Plaintiff's subjective complaints of pain. (R. 109.) Indeed, Plaintiff testified specifically that she could only sit for 90 minutes at a time before needing to stand up, testimony the ALJ apparently credited by including it in his RFC. But there was a second part to Plaintiff's testimony. She testified that after sitting for 90 minutes, she had to get up and walk around and stretch for 15 minutes, which the ALJ clarified at the hearing needed to be a break and not work time. (R. 36.)

The ALJ never explained why he credited the part of the Plaintiff's testimony that she was only able to sit for 90 minutes at a time by including that limitation in the RFC without similarly crediting her testimony about then needing to take a break to walk and stretch for 15 minutes. The

16

Commissioner argues that the sit/stand option is acceptable because it "went further than both doctors by crediting plaintiff's testimony that she could sit for 90 minutes before needing to get up for 15 minutes." (Def. Mem. in Support of Summ. J. at 5.) But that is not what the ALJ did; he only credited the first part of Plaintiff's testimony and did not justify his decision or otherwise build a logical bridge from the evidence to his decision, in that he omitted the second part of her testimony. The ALJ gives no explanation for the inconsistency in how he treated Plaintiff's testimony. Instead, his hypothetical to the VE ignored Plaintiff's need to take 15-minute breaks every 90 minutes and instead suggested that he intended for Plaintiff to be working during her 30-minute "stand" option.

In such a case, the ALJ must explain what medical evidence supports his determination that Plaintiff can stand for 30 full minutes and work during that time. *Lanigan*, 865 F.3d at 563 (7th Cir. 2017) (remanding where ALJ failed to support determination about how long claimant would be off-task.) But the ALJ's justification for the sit/stand option is inadequate. The only times the record discusses Plaintiff's ability to stand for 30 minutes are Dr. Thaker's opinion, to which the ALJ rejected, and the State Agency opinion, to which the ALJ gave "great weight."[14] While an ALJ has the right to favor a non-examining medical expert over a treating doctor, he or she must adequately justify the decision with evidence from the record. *Loftis v. Berryhill*, No. 15 C 10453, 2017 WL 2311214 at *4 (N.D.Ill. May 26, 2017). The ALJ did not provide such justification here.

The ALJ rejected Dr. Thaker's opinion in part because Plaintiff reported only mild to moderate fibromyalgia symptoms, and because her ADLs were inconsistent with the level of

---

[14] Dr. Thaker opined that Plaintiff would be able to work a total of four hours in an eight-hour day: a total of two hours sitting and two hours standing, which would render her unemployable. (R. 553.)

limitation Dr. Thaker imposed.[15] The ALJ gave great weight to the State Agency doctors' opinions because they were consistent with the conservative treatment of record. As we explained above, the ALJ's consideration of these factors was flawed. Specifically, the ALJ ignored Plaintiff's unrebutted testimony that she could not complete any of her ADLs without taking a break every 15 minutes, and also failed to recognize that Plaintiff took prescription medication to treat her fibromyalgia and that she was prevented from taking stronger doses because of the concern about side effects. The record thus does not allow the Court to trace to medical evidence the ALJ's determination that Plaintiff could work an entire eight-hour day if she was allowed to sit for 90 minutes and then stand for 30.

In addition, Plaintiff's unrebutted testimony that she needs to walk around and stretch for 15 minutes after sitting for 90 (a scenario the Commissioner endorses at page five of his response brief) destroys any logical bridge to the ALJ's sit/stand option. Under this restriction, over the course of an eight-hour work day, Plaintiff would be off-task, walking and stretching, for 60 minutes, which is greater than the 10 percent off-task limit in the RFC.[16] Accepting both parts of Plaintiff's testimony that she can sit for 90 minutes before needing to stand and stretch off-task for 15 minutes, the evidence indicates that she would be unemployable.

---

[15] We focus on these two reasons because they relate to Plaintiff's ability to work despite her fibromyalgia, which is the focus of the sit/stand option in the RFC. Plaintiff does not contest the ALJ's analysis of Plaintiff's asthma symptoms.

[16] An eight-hour work day is 480 minutes long. Allowing Plaintiff to stand and stretch off-task every 90 minutes would give her four 15-minute breaks, or 60 minutes total, well beyond the 48 minutes that would be 10 percent of her work day.

## CONCLUSION

We are unable to trace the ALJ's reasoning from the medical evidence of Plaintiff's impairments to the conclusion that she is not disabled. We therefore remand the case to the ALJ for further proceedings consistent with our opinion.

**ENTER:**

**GABRIEL A. FUENTES**
**United States Magistrate Judge**

**DATED: February 4, 2020**